UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-09-027-JLQ |
| Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER DENYING MOTION TO SUPPRESS** |
| FRANK MURINKO, | |
| Defendant. | |

**BEFORE THE COURT** is the Defendant's Motion to Suppress (Ct. Rec. 53). The court held an evidentiary hearing on the Motion on Thursday, August 6, 2009. Stephanie Lister appeared on behalf of the Government. Kailey Moran appeared on behalf of the Defendant, who was also present. Testimony was given by Agents McEuen and Harrill of the FBI, and Mr. Murinko. This Order is intended to memorialize and supplement the Findings of Fact and oral rulings of the court given during and at the conclusion of the evidentiary hearing.

Possession of child pornography charges have been filed against Mr. Murinko. He moved to suppress both the physical evidence found on his computer and statements allegedly made to FBI agents based on three theories: 1) Mr. Murinko did not validly consent to the seizure and search of his computer; 2) the two months that elapsed between the seizure of his computer and the obtaining of a search warrant violated the Fourth Amendment; and 3) the incriminating statements of Mr. Murinko on several occasions were in violation of the Fifth Amendment. For the reasons stated herein, the Motion to Suppress is **DENIED**.

**FINDINGS OF FACT**

On March 13, 2007, FBI agents Harrill and McEuen came to Mr. Murinko's home in Spokane, Washington. Mr. Murinko was at the home alone. His wife was at work and his children were in school. The agents identified themselves and asked Mr. Murinko if they could come into his home and talk with him. Mr. Murinko, who had no prior contact with law enforcement or the criminal justice system, acceded to that request and invited the agents into his home. While seated at a table, the agents informed Mr. Murinko that based on evidence gained from a website previously investigated, he was being investigated concerning possible possession of child pornography. The agents informed Mr. Murinko that he was not under arrest and they would leave anytime he told them to do so, but he was not read his *Miranda* rights.

Mr. Murinko cooperated with the agents and told them of his online activities involving child pornography. At the conclusion of the interview, Mr. Murinko was given a short statement (Ex. A) to sign and informed that he was not obligated to sign it. Mr. Murinko was not informed that the statement could subsequently be used against him. Mr. Murinko signed the statement and also signed a "Consent to Search" form (Ex. B) at this time. Agent Harrill obtained a device from his car to scan the children's computer for pornography. While Agent Harrill was obtaining that device, according to Mr. Murinko, Agent McEuen informed Mr. Murinko that if he did not consent to the agents taking his computer, a search warrant would be obtained. Agent McEuen was not called back to the stand to rebut or comment on this alleged statement although in his direct testimony he stated that he made no search warrant statements to Mr. Murinko.

The scan on the children's computer was negative and that computer was not seized by the agents. The scan was not performed on Mr. Murinko's computer. The agents took Mr. Murinko's internet computer, but left behind his children's non-internet computer. Mr. Murinko's computer had on it, *inter alia*, information concerning his commercial cleaning business and family items such as family pictures. The agents were in Mr. Murinko's house for an hour and one-half. He appeared agitated and distraught

throughout the interview, but prior to their departure informed the agents that he would not harm himself.

On May 24, 2007, the agents requested and received a federal court search warrant for Mr. Murinko's computer.  On May 31, 2007, Mr. Murinko, again distraught and agitated, phoned the agents to inquire as to the status of the computer search. He was told it was on-going and no timetable could be given for its conclusion.  The agent, noting Mr. Murinko's agitation, requested that another agent trained in crisis negotiation join the conversation.  Mr. Murinko again stated that he did not intend to harm himself, although the agents were obviously concerned as to that possibility.

On December 19, 2007, Mr. Murinko was asked on the telephone by an FBI agent if they could interview him at his home again.  Mr. Murinko requested that the interview take place at FBI offices since his wife and children were at home.  He traveled on his own to the FBI office and was seated in an unlocked interview room.  He was told he could terminate the interview at any time.  At this time, Mr. Murinko asked Agent McEuen if he needed an attorney, and was told by Agent McEuen that "no legal advice could or would be given." There is no evidence that either Mr. Murinko or Agent McEuen pursued that matter further.  Agent Harrill then arrived in the interview room and reiterated that Mr. Murinko was not under arrest, could leave at any time, and was under no obligation to answer any questions.  Mr. Murinko was provided with a form entitled "Advice of Rights" (Ex.D) which he read.  Mr. Murinko asked if signing the form obligated him to answer questions.  He was told it did not and he was reminded that he was not in custody or obligated to answer any questions.  Mr. Murinko declined to sign the form, but continued the interview.  Mr. Murinko stated that the statement he signed during his home interview was accurate.  Mr. Murinko then volunteered further details of his internet activity involving underage females.  Mr. Murinko reviewed a form FD-302 report authored by one of the agents detailing what was found during the forensic review of his computer's hard drive.  The interview lasted an hour and a half,

and Mr. Murinko confirmed that he was not impaired in any way during the interview.  A further statement regarding the March 13, 2007 interview was prepared which Mr. Murinko signed at this time (Ex. F).

In March 2009, a grand jury Indictment charging Mr. Murinko with child pornography offenses was returned and a warrant for Mr. Murinko issued. Mr. Murinko was again contacted by agents and requested to again come to the FBI office, which he did on March 11, 2009.  When Mr. Murinko arrived, he was not advised of the Indictment or warrant, but was provided with another Advice of Rights form, which he signed (Ex. I).  Mr. Murinko signed another statement regarding the December 19, 2007 interview prepared by the Agents (Ex. G).  Only then was Mr. Murinko advised of the Indictment and warrant.  He was then arrested.  Mr. Murinko also prepared a handwritten statement at this time (Ex. H).

## DISCUSSION

A.  Did Mr. Murinko validly consent to the seizure and search of his computer?

A warrantless seizure and/or search is unreasonable, and thus illegal, under the Fourth and Fourteenth Amendments, unless an exception to the warrant requirement applies. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent to a seizure and search is one such exception, if the consent is knowingly and voluntarily provided and not the product of deceit or affirmative misrepresentations by government agents. *United States v. Robson*, 477 F.2d 13, 17 (9th Cir.1973). To determine if the consent was voluntary and not the product of coercion, the court examines the totality of all of the surrounding circumstances. *Schneckloth*, 412 U.S. at 227.  The Ninth Circuit considers five factors in determining voluntariness: (1) whether the [consenting individual] was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the [consenting individual] was notified that he or she had a right not to consent; and (5) whether the [consenting individual] had been told a search warrant could be obtained.  *United States v. Jones*, 286 F.3d 1146, 1152 (9th

Cir.2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir.1989)).  These factors serve merely as guideposts, "not [as] a mechanized formula to resolve the voluntariness inquiry." *U.S. v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004). Moreover, no one factor is determinative. *Id*.  "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth*, 412 U.S. at 229.

The totality of the circumstances herein satisfy the court that Mr. Murinko validly consented to the seizure and search of his computer.  The agents did not  misrepresent the facts and circumstances of their investigation to Mr. Murinko at the March 13, 2007 interview at the Murinko home.  They informed him of why they were at his house and how they obtained the information that led them there.  During the visit, Mr. Murinko signed both a statement admitting to viewing and receiving child pornography (Ex. A) and consented to the forensic review and search of his computer (Ex. B).  No evidence was presented of any coercion during the one and a half hours the interview lasted.

Mr. Murinko argues that his vulnerability on March 13, 2007 renders his consent implicitly coerced pursuant to *Schneckloth*.  There was nothing presented at the evidentiary hearing to indicate that Mr. Murinko was coerced in any manner, and the court is not required to presume that  all responses to non-custodial police questioning are coerced.  *See Schneckloth*, 412 U.S. at 247.  Mr. Murinko has suggested that he was vulnerable at the time of his interviews.  However, that reaction was one which  would normally be expected of a person confronted with evidence of possession of child pornography.  There was no evidence that the Agents had their guns drawn or that guns were visible.  No evidence established that the agents made any affirmative misrepresentations, or explicitly coerced Mr. Murinko in any way.  Mr. Murinko was emotional during the interview, and he asked the interviewing officers questions regarding procedure and potential punishment.  Mr. Murinko informed the agents that he

would not hurt himself.  Though clearly distraught, the totality of this evidence does not lead to a finding or conclusion that Mr. Murinko was implicitly coerced.  Mr. Murinko's consent to the seizure and search of his computer was validly given.

B.  Search and Seizure

Mr. Murinko next argues that even if his consent to the seizure and search was validly given, the subsequent two-month delay by law enforcement in obtaining a search warrant constituted an undue delay that violated Mr. Murinko's Fourth Amendment possessory interest in his computer.  Mr. Murinko separates the aspects of search and seizure, arguing that even if he consented to the search of his computer, he did not consent to having his computer seized, or the duration of such seizure.

It is established that "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.' " *U.S. v. Jacobsen*, 466 U.S. 109, 124 (1984).  Mr. Murinko signed the "Consent to Search" form on March 13, 2007 (Ex. B), and the search warrant for the search of the computer was issued on May 24, 2007, to be completed on or before June 2, 2007 (Ex. C).

Mr. Murinko relies heavily on a recent Eleventh Circuit case with a fact pattern similar to the case at hand, but with at least one distinguishing factor, that being that in the Murinko case, Mr. Murinko explicitly consented to the search of his computer.  . *U.S. v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009). In *Mitchell* it was held that a 21-day delay in obtaining a warrant to search a seized computer was unreasonable, even considering the owner's admission that the computer contained child pornography The court supported this holding based on the finding that a personal computer contains a plethora of personal information in addition to the pornographic pictures constituting probable cause to seize the computer over the objection of the owner.

Computers are relied upon heavily for personal and business use. Individuals may store personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature in electronic form on their computer hard drives. Thus, the detention of the hard drive for over three weeks before a

warrant was sought constitutes a significant interference with Mitchell's possessory interest. Nor was that interference eliminated by admissions Mitchell made that provided probable cause for the seizure.

*Mitchell*, 565 F.3d at 1351. The court then concluded that the Government had shown no compelling justification for the delay; rather it resulted from scheduling conflicts, and the affidavit in support of the warrant contained boilerplate language that was not specific to the case. *Id.*

However, the factual situation in *Mitchell* is far different from the matter *sub judice*. In Mitchell no consent to search was given for the hard drive that was taken, so a warrant was necessary before the search could begin. In the case at hand, Mr. Murinko validly consented to the search of his computer. There is no case law, and Mr. Murinko does not argue as such, indicating that law enforcement is required to obtain a search warrant once valid consent to search has been given. The agents did not need the warrant to search the computer. The obtaining of the warrant appears to be a standard practice within the Eastern District of Washington because consent can be withdrawn, contested, and the scope thereof challenged.

Having established that Mr. Murinko consented to the search of his computer, thereby obviating the necessity of obtaining a warrant, the actual seizure of the computer must be examined. Mr. Murinko argues that he did not explicitly consent to seizure when he signed the "Consent to Search" form. Mr. Murinko's argument fails for two reasons. First, the testimony of the officers established to the court's satisfaction that Mr. Murinko knew that signing the "Consent to Search" form would include the seizure of his computer. Secondly, and more importantly, Mr. Murinko had made numerous incriminating statements by the time the computer was seized, giving the FBI agents more than sufficient probable cause evidence to justify the seizure of the computer (Ct. Ex. A). Mr. Murinko had informed the agents of the peer-to-peer software programs he used to trade child pornography, the search engines he used to find child pornography content, and the folders on his computer in which he saved the pornographic images of children.

ORDER - 7

1

The Murinko computer was seized with probable cause, and Mr. Murinko
consented to the search thereof. No search warrant was necessary.  The warrant was
obtained as a matter of protocol.  The testimony of the agents established that the actual
search of the hard drive was conducted within the time period mandated by the search
warrant.  Mr. Murinko argues that the search was not completed for many months, but
this is not the case.  The forensic review of the material obtained from the hard drive
took several months, but the actual search of the computer was completed within the
time dictates of the search warrant.  Accordingly, the delay in obtaining a search warrant
did not violate Mr. Murinko's Fourth Amendment possessory interest in his computer
since he consented to the search and seizure. In addition, probable cause existed for the
seizure.

C.  Were Mr. Murinko's statements taken in violation of the Fifth Amendment?

Mr. Murinko next argues that his admissions and confessions were given in
violation of his constitutional rights and must therefore be suppressed as he was not read
his *Miranda* rights prior thereto.   Once law enforcement officers take suspects into
custody, the officers may not interrogate the suspects without first exercising certain
procedural safeguards, including informing the suspects of their rights, *inter alia*, to
remain silent and to have an attorney present.  *Miranda v. Arizona*, 384 U.S. 436, 444
(1966).  "The sine qua non of Miranda is custody. 'By custodial interrogation, we mean
questioning initiated by law enforcement officers after a person has been taken into
custody or otherwise deprived of his freedom of action in any significant way.' " *U.S. v.
Butler,* 249 F.3d 1094, 1098 (9th Cir. 2001)(quoting *Miranda v. Arizona*, 384 U.S. 436,
444 (1966)).  Accordingly, the voluntary statements made by Mr. Murinko while he was
not in custody are admissible.

"Our decisions make clear that the initial determination of custody depends on the
objective circumstances of the interrogation, not on the subjective views harbored by
either the interrogating officers or the person being questioned." *Stansbury v.*

*California*, 511 U.S. 318, 323 (9th Cir. 1994).  However, *Miranda* has not been extended to cover the situation when a person is the "focus" of an investigation and is interviewed at home in a private home in a non-custodial setting.  *Beckwith v. U.S.*, 425 U.S. 341, 345 (1976).

Even when not formally taken into police custody, a suspect can still be "considered 'in custody' for purpose of *Miranda* if the suspect has been 'deprived of his freedom of action in any significant way.' " *U.S. v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008)(internal citations omitted).  "Factors in determining whether an individual is "in custody" for *Miranda* purposes include: (1) language used to summon the individual; (2) extent to which the defendant is confronted with evidence of guilt; (3) physical surroundings of interrogation; (4) duration of detention; and (5) degree of pressure applied to detain the individual."  *U.S. v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).

Mr. Murinko was not in custody at the times when he made incriminating statements.  On March 13, 2007, Mr. Murinko was not in custody at his home and the facts of his situation include those considered by the Supreme Court in *Beckwith*.  Mr. Murinko was the focus of an investigation, and he was questioned in his private home.  However, he was informed that he was in no way under arrest, could end the interview and ask the officers to leave at anytime. The interview lasted an hour and a half.  There is no evidence presented of any undue pressure placed on Mr. Murinko.

Similarly, during the interview at the FBI offices on December 19, 2007, Mr. Murinko was not in custody.  Mr. Murinko traveled to those offices on his own instead of allowing agents to come to his home. He was consistently informed that he was not under arrest, was not obligated to answer any questions, and could terminate the interview at any time.  Mr. Murinko was provided with a form entitled "Advice of Rights" at this time containing the *Miranda* warnings (Ex. D).

The statements given by Mr. Murinko on March 11, 2009, after he had been indicted, were given freely and subsequent to Mr. Murinko having been advised of his

*Miranda* rights.   Mr. Murinko signed an Advice of Rights form at 9:20 a.m. (Ex. I), and then he signed another statement regarding the December 19, 2007 interview prepared by the Agents (Ex. G) at 9:35 a.m.  Mr. Murinko's handwritten supplemental statement (Ex. H) does not indicate the time at which it was signed, but as it supplements his previous statement, the court finds that it was signed subsequent to the signing of the Advice of Rights form.

D.  Invocation of the right to counsel

Defense counsel orally moved to suppress Mr. Murinko's incriminating statements and confessions given at the December 19, 2007 interview based on his alleged invocation of the right to counsel by asking the agent if he needed an attorney.  This argument is premised on a suggestion that Mr. Murinko was in custody at the time this statement was made.  The court has found to the contrary. Under *Miranda,* a person may invoke his right to counsel at any time after being taken into custody, so long as it is in the context of an imminent custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966).  If Mr. Murinko was in custody and he invoked his right to counsel, the interrogation must end until counsel has been made available to the person in custody, unless the accused himself initiates further communication, exchanges, or conversations with the police.  *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981).

There is no evidence, and Mr. Murinko does not argue, that his question concerning the need for counsel took place in a custodial setting after a *Miranda* waiver, in which case invocation must be "unequivocal" and "unambiguous" to trigger the protection of *Edwards.  Davis v. U.S.,* 512 U.S. 452, 452 (1994).  Under *Davis*, Mr. Murinko's statement cannot be construed as a clear, unequivocal, unambiguous invocation of the right to counsel.  However, **prior** to any waiver of *Miranda* rights, an ambiguous request for counsel by a person in custody requires the interviewing officers to stop any questioning and clarify and determine a defendant's request.  *U.S. v. Rodriguez*, 518 F.3d 1072, 1080 (2008).  This is the scenario Mr. Murinko argues occurred; that he equivocally and ambiguously invoked his right to counsel in a custodial

setting prior to being read his *Miranda* rights or any *Miranda* waiver on his part, thereby requiring the FBI agents to stop and clarify his statement, an action they did not take.

Based on the last fifteen years of federal and state court decisions interpreting the *Davis* decision, Mr. Murinko's question concerning whether he needed an attorney is certainly an ambiguous invocation of the right to counsel. For example, the following statements have been found to be ambiguous or equivocal: "Maybe I should talk to a lawyer," *Davis*, 512 U.S. at 462; "If I need a lawyer, tell me now," *State v. Harris*, 741 N.W.2d 1, 6 (Iowa 2007); "I think I need an attorney," *State v. Morgan*, 559 N.W.2d 603, 608 (Iowa 1997); "You want to arrest me for stealing a car, then let me call a lawyer and I'll have a lawyer appointed to me and, because this is going nowhere," *State v. Spears*, 184 Ariz. 277, 908 P.2d 1062, 1071 (Ariz.1996); "Can I have someone else present too, I mean just for my safety,like a lawyer like y'all just said?", *Commonwealth v. Hilliard*, 270 Va. 42, 613 S.E.2d 579, 585 (Va. 2005). As Justice Souter pointed out in his Davis concurrence, "social science confirms what common sense would suggest, that individuals who feel intimidated or powerless are more likely to speak in equivocal or nonstandard terms when no ambiguity or equivocation is meant."

If it were determined that Mr. Murinko was, in fact in custody when he asked if he needed an attorney, the FBI agents would have been required by *Davis* to halt the questioning at that point and clarify the request. However, the court has found that Mr. Murinko was not in custody at the December 19, 2007 interview, and, accordingly, the agents response that they could not give legal advice was proper. *See U.S. v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992)("Therefore, if Hines was not in custody during the first interview, the reference to his lawyer at that time cannot be considered an invocation of *Miranda* rights.").

## CONCLUSION

Mr. Murinko validly consented to the seizure and search of his computer. In addition, probable cause existed for the seizure of the computer. His statements to the agents were freely and voluntarily given when, with the exception of March 11, 2009

1

2  statements, he was not in custody.  The March 11, 2009 statement(s) were freely and
voluntarily given after Mr. Murinko had been advised of his *Miranda* rights.

3          The Motion To Suppress (Ct. Rec. 53) must be and is **DENIED**

4          **IT IS SO ORDERED**:

5  The Clerk is hereby directed to enter this Order and furnish copies to counsel.

6          **DATED** this 12th day of August, 2009.

7                              s/ Justin L. Quackenbush
                            JUSTIN L. QUACKENBUSH
8                    SENIOR UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER - 12